2021 IL App (2d) 191138-U
No. 2-19-1138
Order filed December 9, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-296 |
| MUSATDIN MUADINOV, | ) ) ) | Honorable Donald M. Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant was properly convicted of disorderly conduct for creating a false alarm that he had placed explosives or other dangerous substances in a truck that he parked near a casino's entrance. Defendant's strange behavior and menacing statements to casino employees, including that he wished to destroy the casino, created the impression that the truck posed a threat.

¶ 2    Following a bench trial in the circuit court of Kane County, defendant, Musatdin Muadinov, was found guilty of disorderly conduct (720 ILCS 5/26-1(a)(3) (West 2018)) and was sentenced to 24 months of probation and 180 days in the county jail. Defendant argues on appeal that the evidence was insufficient to prove his guilt beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The indictment alleged that defendant committed disorderly conduct, a Class 3 felony (see *id.* § 26-1(a)(3), (b)), in that he:

"caused to be transmitted to individuals present at the Hollywood Casino, in Aurora, Illinois[,] a false alarm to the effect that a bomb or other explosive of any nature or a container holding poison gas, a deadly biological or chemical contaminant, or radioactive substance was concealed in a truck parked on Hollywood Casino property, a place where its explosion or release would endanger human life, knowing at the time of the transmission that there was no reasonable ground for believing that the bomb, explosive or a container holding poison gas, a deadly biological or chemical contaminant, or radioactive substance was concealed in the place."

¶ 5      At trial, a cocktail waitress at the Hollywood Casino in Aurora testified that, at around 10 p.m. on February 11, 2019, defendant approached her and asked her to cover herself up. She responded that her outfit was her uniform. Defendant raised his voice and again asked her to cover up. When he asked her to cover up a third time, she asked if he would like to speak to her manager. Her manager, Daniel Regalado, talked with defendant. Regalado testified that defendant initially complained about the women's uniforms. Then he wanted to know what Regalado did and who he worked for. He also wanted to know "who the VP was; you know, basically, who was running the casino." Defendant wanted Regalado to call him Abu Mohammed, which meant Father Mohammed. Defendant told Regalado that he was going to receive a gift the next day. Regalado took defendant's telephone number. Defendant made Regalado guess the last digit until he finally had it correct. Defendant told Regalado that if he guessed the last digit, he would receive a gift. Regalado sent an e-mail to his supervisor, Greg Lawrence, conveying defendant's concerns.

Lawrence forwarded the e-mail to Matthew Rzepka, who was then vice president of nongaming operations.

¶ 6    Willie Baker, the security supervisor at the casino, testified that, at about 1:30 a.m. on February 12, 2019, defendant approached him and asked how many exits the property had.

¶ 7    Timothy Singer, the casino's lead valet, testified that, at about 2 p.m. on February 12, 2019, defendant drove a large blue truck into the handicap valet area. Singer told defendant he needed to move the truck, but defendant initially ignored him and went inside the casino. Singer followed defendant into the casino and saw that he was talking with Lawrence. Singer apologized for interrupting the conversation and said that defendant needed to move the truck. Defendant came back out and "moved [the truck] up, just kind of from the front of our entrance to just in front of the door." The truck was "still kind of blocking traffic," but Singer was able to squeeze through. Singer did not want to interrupt defendant and Lawrence again, so Singer did not ask defendant to reposition the truck.

¶ 8    Rzepka testified that, on the morning of February 12, 2019, he read Regalado's email that Lawrence forwarded. Rzepka then phoned defendant. Defendant wanted to meet with Rzepka right away, and Rzepka agreed. Shortly thereafter, Rzepka got a call from security informing him that there was a guest in the boarding area who wanted to talk about the "girls' uniforms." Rzepka brought Lawrence along to the boarding area to meet with defendant. Defendant was wearing traditional Muslim "garb." Rzepka asked defendant about his objection to the waitresses' uniforms, but defendant immediately changed the subject and asked who owned the casino. Rzepka said that Penn National Gaming owned it. Defendant responded that that was incorrect. He indicated that all the casinos in Illinois had been given to the Muslims by " 'the big man.' "

Defendant explained that the "big man" was Donald Trump. Defendant said that he was now the CEO of the casino. Rzepka described the following exchange with defendant:

"I said, 'Well, what are your plans?' He says, 'Well, my plan is that we're going to take over even'—I said, 'Well, I don't know how you're going to take over.' He said, 'Well, even if I have to shoot'—or he used the word 'shot' or 'shoot' that first time and then repeated it to bring clarity to it in the same conversation. Within moments, the clarity was brought."

Rzepka later testified that defendant said, " 'If we have to, we'll shoot.' " After his memory was refreshed with the written statement, he had prepared for security records, Rzepka testified that defendant said, " 'We're going to take over these casinos even if we have to shoot or shot to take them.' " When Rzepka heard defendant mention " 'shoot,' " which for Rzepka was a "trigger" word, Rzepka directed Lawrence to contact the on-site Illinois Gaming Board (IGB) officers.

¶ 9     IGB police officer Shane Hibbs testified that, at about 2:30 on February 12, 2019, he had a conversation with defendant. Hibbs asked defendant if he had made any statements threatening violence. Defendant said that he had not. Hibbs asked what business defendant had at the casino. Defendant responded that he was there to receive the casino as a gift from Allah and that Donald Trump specifically told him that he could have possession of the casino. Defendant repeatedly demanded that Hibbs sign the casino over to him immediately. Hibbs, of course, refused, and defendant demanded that Hibbs put Donald Trump on the phone.

¶ 10     Hibbs was asked whether defendant said what he planned to do with the casino once it was signed over. According to Hibbs, defendant said that he wanted to "destroy the casinos"[1] and

---

[1] According to Hibbs, defendant said that he planned to acquire all casinos in Illinois.

replace them with something more family friendly. Hibbs asked defendant how he intended to obtain the casino. Defendant said he did not want to hurt anybody and was not there to commit any violence, but he would do whatever was necessary to obtain the casino. Defendant said that he consulted with Allah about what to do if the casino was not signed over to him. Defendant would do whatever Allah told him to. At some point during the conversation, Hibbs learned that there was a truck parked in the main entrance that was blocking entry and exit from the casino. Shortly afterward, Hibbs decided to place defendant in handcuffs because Hibbs feared for his life and the lives of others. The casino was evacuated.

¶ 11 On cross-examination, Hibbs testified that, upon learning about the truck, he asked defendant about it. Defendant told him that he was living in the truck, which he and his brother used in their moving business. According to defendant, the truck contained his personal belongings.

¶ 12 Aurora police officer Todd Coleman testified that he was dispatched to the Casino at about 3 p.m. on February 12, 2019. He spoke with defendant. Defendant told Coleman that he came to the Hollywood Casino because it had the word " 'holy' " in its name and he thought that that was wrong. He had observed illegal activity such as drug dealing taking place and he wanted to speak with " 'our leader,' " Donald Trump. Coleman said that he did not think he could get Donald Trump there but that he might be able to get his sergeant or lieutenant. Defendant responded that if he was not able to get Donald Trump, he should get the owner of the casino. Coleman asked defendant why he wanted to speak to the casino's owner. Defendant replied that he "had wanted to give them a gift and that the gift was a message." The message was from Allah, and if "our leaders" did not accept the gift, defendant would pray to Allah to destroy the casino.

¶ 13    Coleman asked defendant about the truck, and defendant said that it contained furniture and "[v]arious things from him moving." Defendant stated that there was nothing dangerous or illegal in the truck. Coleman asked for permission to search the truck, and defendant granted it.

¶ 14    Surveillance video at the casino showed that, between approximately 10 p.m. on February 11, 2019, and 12:30 a.m. on February 12, 2019, defendant was wandering around the gaming areas of the casino without gambling. Defendant went through all the open gaming areas on more than one occasion. The video showed that, at about 2 p.m. on February 12, 2019, defendant parked a blue box truck in the handicapped valet area. After speaking with a valet and a security guard, defendant moved the truck a short distance.

¶ 15    Aurora police officer David Brian spoke with defendant after Coleman did. When he arrived at the casino, he observed a large box truck parked just outside the valet parking. Defendant asked Brian who his leader was. He also asked Brian to bring his leader to him. Defendant clarified that Brian should bring Donald Trump to him and if he did not, they would all meet Allah. Defendant mentioned that he did not like casinos and that he planned on destroying them. He wanted to take over all the casinos and donate the property to Muslims. Brian testified that when defendant "would mention Allah and destroying, he would have a big smile on his face."

¶ 16    After the State rested, the defense presented the parties' stipulation that a bomb squad searched the truck and found that it contained furniture. There was nothing dangerous or illegal in the truck.

¶ 17    The defense also presented the testimony of Matthew Huber, an Aurora police investigator. Huber testified that he moved defendant into a squad car and interviewed him for two and a half to three hours. Defendant was calm and conversational during the interview.

¶ 18    Lawrence testified for the defense that, while meeting with defendant and Rzepka, he heard defendant use the word " 'shoot' " or " 'shot.' " Because defendant had been saying "some odd things," Lawrence did not react to that word. Lawrence had no idea what defendant's intentions were.

¶ 19    Defendant did not testify.

¶ 20    The trial court found defendant guilty of disorderly conduct. The court reasoned, *inter alia*, that defendant, having improperly parked a large box truck in front of the casino and then engaged in conversations in which he discussed destroying the casino, created a false alarm that there was a bomb concealed in the truck.

¶ 21                              II. ANALYSIS

¶ 22    Defendant argues that the State failed to prove his guilt of disorderly conduct beyond a reasonable doubt. Our review of this argument is governed by the following familiar principles:

> "When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. [Citation.] The critical inquiry is whether the evidence could reasonably support a guilty finding, regardless of whether the evidence is direct or circumstantial. [Citation.] The fact finder is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. [Citation.] 'Because the trier of fact is best positioned to judge the credibility of the witnesses and resolve disputes in the evidence, its decision is entitled to great deference.' [Citation.] We will reverse the defendant's conviction only where the evidence is so unreasonable,

improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. [Citation.]" *People v. Hubbell*, 2021 IL App (2d) 190442, ¶ 14.

¶ 23   Section 26-1(a)(3) of the Criminal Code of 2012 (720 ILCS 5/26-1(a)(3) (West 2018)) provides:

> (a) A person commits disorderly conduct when he or she knowingly:
>
> * * *
>
> (3) Transmits or causes to be transmitted in any manner to another a false alarm to the effect that a bomb or other explosive of any nature or a container holding poison gas, a deadly biological or chemical contaminant, or radioactive substance is concealed in a place where its explosion or release would endanger human life, knowing at the time of the transmission that there is no reasonable ground for believing that the bomb, explosive or a container holding poison gas, a deadly biological or chemical contaminant, or radioactive substance is concealed in the place."

¶ 24   Defendant stresses that he never verbally conveyed a bomb threat. However, nothing in the statute defining the offense requires a verbal transmission. "Transmit" has been defined as "To send or transfer (a thing) from one person or place to another" or "To communicate." Black's Law Dictionary (11th ed. 2019). Communication can be verbal, nonverbal, or a combination. Defendant parked a large truck in front of the casino in a place where it apparently did not belong. The significance of this fact must be considered in light of widely publicized instances of terrorists in the United States and abroad detonating trucks filled with explosives, causing significant property damage, fatalities, and injuries. Most notably perhaps, in 1995, Timothy McVeigh used a truck bomb to destroy a federal building in Oklahoma City, killing roughly 170 people. See *U.S. v. McVeigh,* 153 F.3d 1166, 1176 (10th Cir. 1998). A few years earlier, a bomb concealed in a van

exploded in the World Trade Center, killing 6, injuring over 1000, and causing hundreds of millions of dollars in damage. *U.S. v. Salameh*, 152 F.3d 88, 108 (2d Cir. 1998). Incidents like these justify a vigilant attitude toward suspiciously parked vehicles that might harbor explosives.

¶ 25    We do not mean to suggest that the mere suspicious parking of a truck necessarily amounts to a false bomb threat. Here, however, the suspiciously parked truck must be viewed in light of defendant's bizarre and menacing behavior. Between February 11 and February 12, 2019, defendant spent hours in the casino, but did not gamble. He inquired about the building's exits. He claimed that the casino had been given to Muslims and that he was CEO of the casino. He said that he would "shoot" if necessary to take over the casino. He also expressed a desire to destroy the casino. Moreover, he demanded the presence of Donald Trump and said that if casino employees did not bring him, they would all meet Allah. Given these circumstances, a rational trier of fact could conclude that defendant transmitted a false alarm to the effect that a bomb was concealed in his truck.

¶ 26    Defendant argues that "an illegally-parked vehicle is not necessarily menacing, especially in light of evidence that [defendant] was anxious to attend the meeting with Rzepka and that he complied with the valet's second request to move [the truck]." Defendant further notes that he was neither coy nor threatening when asked about his truck. However, it was the trial court's responsibility to determine what weight to give this evidence. We will not substitute our judgment for the trial court's. The evidence was sufficient to prove defendant's guilt beyond a reasonable doubt.

¶ 27                                III. CONCLUSION

¶ 28    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 29    Affirmed.